WILLIAM CLAIBORNE
and David Minge, the former of whom liad received fifteen hundred pounds from James Field, hy loan, for repayment thereof, sealed and delivered their obligation, in these words : ‘knowall men, bythese presents, that we William Claiborne and David Minge are held and firmly hound unto doctor James Field, of Princegeorge county, in the just and full sum of three thousand pounds, current money; to he paid unto the said doctor James Field, his certain attorney, his heirs, executors, administrators, or assigns ; to which payment, well and truly to be made, we bind ourselves, our heirs, -executors, and administrators, firmly by these presents; sealed with our seals, and dated this eleventh day of august, one thousand seven hundred and seventy eight, the condition of the above obligation is such, that, if the above bound William Claiborne and David Minge do and shall well and truly pay or cause to be paid unto the said doctor James Field, his certain attorney, his executors, administrators, or assigns, the just sum of fifteen hundred pounds, current money of Virginia, on demand, with interest from this day, then the above obligation to be void, or else to remain in full force and virtue.’
David Minge being dead, and William Claiborne being insolvent, the creditors executrix, who could not maintain an action at eommon law against the representatives of the former, as is generally supposed, because the obligation being joint the right of action survived, brought a bill in equity, for recovering the money.
The defendents demurred to the bill, shewing for causes, that the representative of David Minge, who died in the lifetime of the other obligator, was discharged hy that event; that *274 the hill contained no equity ; and that the plaintiff might have an action at common law against the surviving obligor.
The first and second causes seeming false, and the third trifling, the high court of chancery overuled the demurrer upon argument, on the 15th day of may, 1794, delivering this, opinion : 1 that, by the death of one joint obligor, in the lifetime of the other, the duty of the former is hot discharged, although against his representatives the obligee hath no legal remedy for exacting performance thereof, for which reason the court of equity may properly supply such remedy.’ and that court afterwards, upon a hearing, decreed the defendents to pay to the plaintiff the principal money, due by the obligation, with interest.
This decree was, in October, 1795, reversed by the court of appeals, their opinion, preceding the reversal, is stated thus: £ that the testator David Miiige, having been neither the borrower nor the user of the money lent to and used by Claiborne but a'Security only, ought not, in equity, to be further or otherwise bound than he was by the contract bound at law ; and, no fraud or mistake appearing to have occurred in the writing of the bond, it is to be considered as a joint obligation, and subject to the legal consequence of Minge and his representatives being discharged 'by the death of him, in the lifetime of Claiborne ; and that the said decree is erroneous.’
■ The decree of the high court of chancery was thought, by him who pronounced it, and will be thought, as he believeth, by most other men, to be consonant with purest principles of justice ; not to be repugnant to any principle of the common law, that is, of its moral part; and to have been dictated by the spirit, which revealed the utility and necessity, and designated the functions, of the court of equity.
To prove that he, at whose request, and in confidence of whose cautionary engagement for another, one man lends his money to that other, is bound to restore-the money, as conscientiously as he would have been bound, if he had applied it to his proper use ; and that, if this duty be not performed by the cautioner, the representatives who succede to his goods, are ■bound, no less than he was bound, if those goods will enable them, to perform it, will not be attempted ; because these propositions are thought to be- of equal dignity with axioms, and to him wh'o requireth a proof of them no intellectual truth whatever can be proved.
That the common law (a) hath declared an obligation, ori *275 ginating by contract, to be discharged by any thing, but performance of the act undertaken to be performed, or by consent of him who had a right to exact performance, will be denied, until it shall be proved, otherwise than by deduction from want of a legal remedy to coerce performance.
That one capital branch of the court of equitys jurisdiction is to supply defects, unavoidable in such a system as that which is called the common law, — unavoidable in every system of jurisprudence, contrived by human wisdom, when it is reduced to a text, — every man conversant with those subjects, will admit.
Such a man knows the province of the court of equity to he,
First, to invent and apply remedies for recovering, preserving, and securing rights, and for represing, anticipating, and repairing wrongs, in cases where the common law had never provided remedies ;
Secondly, to modify the remedies provided by the common law, amplifying them in cases where they afford scanty, and abridging them in cases where they afford excessive, measures of reparation -,
Thirdly, to restore the remedies, or to substitute other for the remedies, which had been provided by the common law, but of which the parties are deprived, not by vices in the constitution of the rights clamed, but by impracticability of formulae, the observance of which in prosecution of the remedies had been required, — the rights theirselves remaining unchanged, but the modes of asserting them being such as, from intermediate events, not through default in the parties, cannot he pursued.
In administering these remedies, the court of equity doth not thwart or counteract, but doth promote and accomplish tiie design of, the common law itself.
Examples of the former heads of division are not pertinent to this case, the subjoined examples of the other may be useful! for illustration :
1. F lends money to C, who, for repayment thereof, seals and delivers his obligation.
*276 The remedy, provided by the common law, to recover the money is an action of debt.
F, losing the writen obligation, which was evidence of the debt, can maintain no action whatever, by common law.
He cannot maintain the action upon an implied promise, which he might have maintained, if he had not taken the writen obligation, because the promise, termed a simple contract, was merged in the writen obligation, termed a specialty, the name by which eveiy act of that kind, with a seal affixed or appended to it, is called.
He cannot maintain an action of debt upon this ; because, if in the declaration, after recital of the specialty, he omit the profert in curia, as it is called, that is, if he do not add these words, (which writing obligatory is brought into court/ or the like, except in some particular cases, the defendent may demur to the declaration, and judgment will be given for him. if the declaration contain the profert in curia, the defendent cannot be ruled to plead, before the specialty, or, in some instances an authentic copy of it, shall have been shewn, — may demand a hearing of it, and the plaintiff, failing to produce it, will be non-suit.
In such a case, to say, the right of F to the money is vitiated by the loss of a paper, which the law requireth to be produced, because it is regularly the legal evidence of the right, — to suppose the common law to have willed and intended, (if to such an allegorical being we may attribute volition and design,) when the rule, that a specialty, by which a thing is demanded, should be exhibited, not because the demand was on that account more just, but, that the court might judge whether the specialty were a valid act, was established, — to affirm the common law to have willed and intended, that the creditor, by such an accident, as the loss of this paper, should be deprived of his property, would betray stupid ignorance.
The law wills and intends, that justice should be done in every case ; that was the object of it, when its rules were established, and its formulae prescribed ; but those rules and formulae, in particular cases, are the very means of injustice ; as in case of the obligation lost.
Men, who delight in quaintness of phrase, and suppose themselves to discover in it pith of argument, in such, a case as this, have said, ‘ want of remedy and want of right are the same/ and hence, by that gross sophism, where concerning the essential properties of a subject, is affirmed or denied that, which is true or false of something accidental only to the subject, infer, that when the EV1DEM CE required by law to prove *277 a debt is LOST, so that the legal remedy to recover it cannot be pursued, the OBLIGATION to pay the debt is DISCHARGED. they have maintained even a greater absurdity, — have asserted that, where the legal title to property, of a particular kind, could not he recovered, because the remedy to recover it could not be prosecuted during a certain time only, upon this principle, as it is said, of the common law, that a personal action once suspcírif?/! >s extinct, (Hobarts reports p. 10. 1 Salkelds reports p. dO'O in such a case, even the court of equity ought not to inter. (b)
The common law hath indeed exposed and abandoned that right, which was its own offspring originaly, the legal evidence of which cannot be produced, being not unwilling, but, unable, without disordering soino parts of its oeconomy in the praxis, to cherish and maintain the right.
This is a delect in the law, if it intended, as surely one may venture to affirm it did intend, that justice should be done in every case.
Here, then, the court of equity supplies the defect, by which the right, from debility in the parent of it to support it, would have perished, and undertaking the benign office, which the common law reluctantly declined, adopts, and, in loco parents, fosters and educates the foundling.
2. Again : P lends money to O and M who, for repayment *278 thereof, sealed and delivered their obligation, -writen in the form which constitutes in the law nomenclature, a joint bond, in contradistinction to a bond joint and several. (c)
The remedy provided by the common law, whilst C and M Jive, is an action of debt against them both jointly.
If M die before C, F cannot maintain one action against O and the executor or adminstrator of M, because, by the common law, the judgements ought to be against one in his proper, against the other in his representative, character ; moreover the writs of execution, conformably with the judgements, must be that satisfaction be made, of one, out of the goods and chatels of the defunct, of the other, out of the goods and e-hatels of the surviving, obligor, or by his imprisonment; but an union of such different sentences, and such different modes of executing them, is irregular.
Neither can F maintain a separate action, as is said, against the executor or administrator of M, because the obligation, being joint, in the law language, the action survived. (d)
*279 In this case Uto, for reasons explained before, the court of equity, yielding ill to remedy which the court of common low, constrained by forms prescribed for its governance in ordinary cases, witholds, v*v-ffd subject the estate of M, in the hands of his represent- : ! * - to payment of the money borrowed.
The opinion y ¡ cree of the court of appeals are supposed, instead of cont: 1 u . g, to have approved, the doctrine herein before stated in -lapse examples, unless perhaps, in the second example, they wo: jid have charged the executor or administrator, of M with so much only of the money borrowed as could be proved to have ík-cíi used by himself, and thus have made important the inquiry how much of the money borrowed he used, and possibly which way he used it.
But, in the principal case, the plaintiff in her bill having con *280 Tessed the money, for repayment of which William Claiborne and David Minge were bound, to have been] lent to the former obligor, by which circumstance the case is slupposed to be distinguishable from the case stated in that second example, this distinction is believed to be partly, if not solely, the foundation of the reversing decree.
For, unless the opinion preliminary to that decree be misunderstood, which is not impossible, whilst one is ranging among such a groupe of negatives as are there /exhibited, if David Minge had appeared to have either borrowed or used the money, his representative would have been accountable for it.
The rationale of this distinction, and the^ truth of the propositions, and logic of the conclusions, from Which it seemeth to result, will be the subjects of examination,'; in some strictures on that opinion, by way of
C OMMENTARY.
The testator David Minge having been neither the borrower,] when the testator James Field consented to let William Claiborne have money, not on his.credit, but on the credit of David Minge only, the term ‘ borrower,’ applied to David Minge,-perhaps is, not a catachresis but, a proper .appellation, — not less proper than it would be, if David Minge, by his separate obligation, had bound himself to repay money advanced on his credit only to his friend, his son, his servant, or to any one else, if, granting his separate obligation, David Minge would have been a borrower, how the conjunction, with him, of the friend, son, servant, or other user, could disrobe him of the character is not discerned.
Nor user of the money^ for reasons so much like those in the next preceding paragraph, and. suggested so obviously, that adaptation of them to this would seem repitition, the term ‘ user’ is applicable to David Minge as properly as the term c borrower.’
But if these appellations belong not to him, whether, in equity, his representative ought to repay the money borrowed and used, or not, will be discussed hereafter.
Lent to and used, by Claiborne,] on these words no animadversion is necessary, more than that they are a mere pleonasm; for the representative of David Minge, if he were not the borrower or user of the money, was according to the opinion, not bound in equity, for repayment of it, what other man soever was the borrower or user.
But a security only,] security, as the term is here used, is the synonyma of surety, which latter, because it is less equivocal than the former, shall, instead of it, be hereafter employed.
*281 A surety is one bound that something shall he done, not by himself in the first instance but, by some other, and, in case of default by this prime agent, that the obligor shall perform the act, or compensate for nonperformance.
In the principal case, the relation of William Claiborne and David Minge, between themselves, was the relation of debitor and surety, so that the latter, if he had been compelled to repay the money borrowed, might ibr reparation, have resorted to the former, upon one or other of the principles explaned in the case between Lomax and Pendleton. (e)
The legal relatin': of James Field and David Minge, between themselves, was, not lire relation of creditor and surety but, the relation of creditor and principal debitor ; for David Minge binds himself and his heirs, ffce. in a penalty, and the obligation for payment of the penalty he agrees, by the condition, shall remain in force, if he and William Claiborne shall not pay the principal money and interest.
David Minge, therefore, by law was, not a surety, or a security as he is called, but by the terms of the obligation, as much a debitor as the co-obligor William Claiborne.
Ought not, in equity, to be further or otherwise bound than he was, by the contract, bound at law,] the contract itself sheweth him to have been bound at law as far as William Claiborne was bound at law.
Why then ought not the representatives of David Minge, in equity, to be hound as far as the representatives of William Claiborne, if he had died first, would have been bound? the *282 answer, contained in the opinion introductory to the reversing decree, is, he was. neither, first, the borrower, nor, secondly, the user, of the money, but, thirdly, a security only, let all these, although every one of them may plausibly at least be denied, be for argumentsake, granted ; the single question then will be, whether a creditor ought not, in equity, to have like remedy against the suretys representatives as he might have prosecuted against the principal debitors representatives?
If between the obligations of the debitor and surety and their respective representatives to pay, and between the rights of the creditor to demand, from one or other, the money due, in the event which happened, the distinction exist, some reason for it may be and ought to be adduced.
The only specious argument for the distinction, which hath occurred to the commentator, after long, frequent, and diligent investigation, is founded on compassion for an ipnocent surety, as he is called, — improperly called, if we regard! the etymology of the epithet, and the consequence to the ereditlor pretended to be sanctified by it. an innocent man is he, by whose act, or by whose omission, another man is not hurt; but the creditor, losing the money, which he had lent, and the loss of which he would not have hazarded, if the surety had not solemnly agreed to be sponsor for the borrowers sufficiency, is hurt by an act of the surety in procuring the loan, and by his omission to guard against the loss, if his representative be discharged from responsibility.
However that may be, compassion ought not to influence a judge, in whom, acting officialy, apathy is less a vice than sympathy.
The creditor may have mercy upon his necessitous debitor, and forgiveffiim the debt, incurred by borrowing money to support a family, — may be content with Jess than he might rigorously clame from a surety, upon whom the debt of an insolvent falls.' such charity and liberality in the creditor himself are commendable, but when he exacts his dues, the judge cannot constitute himself the creditors almoner, or the dispenser of his bounty, the judge, by the eagerness, which his yearnings excite, to divert the burtheu impending on a surety, ought not to be transported so far as to forget, that his charity and beneficence ought to begin at home ; that his own purse, not the purse of another man, is the source from which the relief he would afford should flow ; and that, whilst he spares the store of a wealthy surety, he may be taking the bread out of the mouths of a creditors starving family, of the cases which can be put, such exoneration of the surety seemeth, in all unjust, arbitrary, oppressive, and, in some, cruel.
*283 The distinction, now under consideration, is oppugned by principles both of law and equity, according to them, the right to demand, and the obligation to make, specific restitution, or vicarious satisfaction, originating by contract, are complete, either, first, by an act of one party beneficial to the other, and performed at his request, or, secondly, by an act of one party detrimental to himself, performed at like request of the other party.
The merits of the party performing the acts, in both cases, are equal in Iog:-l estimation, nor do the principles of equity teach us to exalt liie merit in one above that in the other, or to construct tables for graduating the merits in either of them.
Whoever used tlio money, or in whatever manner he used it, or whether he threw it aw ry, the merit of the lender was the same, because bis detriment in parting with his money was the same, the borrower indeed, obtaining what he wanted and what he cor; not have obtained without the suretys kind office, in procurin'-; iho Joan, is indebted to that benefactor doubly,— owes the (dcbi immense of endless gratitude,’ and is moreover bound to indemnify him ; but the rigid of the lender to demand from them, and their obligation to repay to him, the money borrowed, do not depend upon, and cannot be magnified or diminished by, the right and obligation existing between them, either in law or equity.
When the cause was heard before the high court of chancery, the argument, in support of the distinction, now irrevocably established, consisted, not of reasoning on the subject but, of quotations from, and references to, authorities, (f) of which *284 kinds of argumentation the latter is generaly preferred, because it is not only much easier, but, more influential, than the former.
Of the authorities, quoted by the defendents counsel, that upon which he chiefly relied,- which was not less satisfactory than the other, and the sense of which is transcribed almost literaly into the opinion of the court of appeals, is this case of Ratcliffe versus Graves et alios, in Vernon’s reports 1 vol. p. 196.
‘ Walter Ratcliffe, plaintiffs father, having made his will, and plaintiff and his brother John executors and residuary legatees, and they being infants at their fathers death, administration with the will annexed during their minority was granted to Elizabeth Ratcliffe their mother; and the prerogative court upon granting the said administration took the usual bond from the administratrix, in which the two defendents the Heathers were bound, as her sureties, the plaintiffs brother being dead, and having made his will and plaintiff executor, he now brought his bill for an account of the testators personal estate, and as to the defendents the sureties, it was suggested that by fraud and covin, they had got up their said bond, and had procured insufficient, security to be accepted by the prerogative court in the room thereof, but the lord keeper, upon the first opening of the matter, declared he would not charge the sureties further than they were answerable at law ; and dismissed the bill as to that part.’
Upon this case but few observations can be made, because the man who determined it hath not condescended to give a reason for his determination, not only would give no reason, but, interrupted a discussion, turning a deaf ear, when the matter was first opened, to every thing which could have been *285 urged against, and which might have prevaled upon him to repudiate, the opinion, to which he had. been wedded perhaps overfondly. the commentator, when this authority was quoted on another occasion, ventured to affirm, that such a hasty dogmatical abrupt depulsion of the question, rather than decision, which ought always to be preceded by mature deliberation, — a declaration that he would not charge the sureties further than they were ansioerable at law, and this, for any thing appearing to the contrary, only because he would not charge them, as if the will of this lordly judge, like the princely sic volo, sicjubeo, were a law,-deserve th not to be classed among the responso, prudentum ; — and moreover ventured to affirm, that it is intitled to less respect than one of the cases which are called anomalous, not only deviating from general principles, admited universaly to be the foundation of resort to the court of equity for relief, where the party applying for it is remediless at common law but, contradicting those principles where they have been recognized and exemplified in particular cases, not rationaly distinguishable from it; in proof of which, besides the cases herein before adduced, by way of examples, let a reference be to the case of Underwood against Staney, reported in chancery cases, p. 77, which was thus :
£ The obligee in a bond of twenty years old exhibits his bill against the administrator of the principal and the surety (upon loss of the bond.) the administrator saith by his answer that he hath no assets. Upon hearing the cause, it was directed to a trial, whether the surety had sealed and delivered the bond ; and a verdict had passed against the surety, (viz.) that he had sealed and entered into the bond, and the cause coming back to this court, and the plaintiffs counsil praying a decree for tne plaintiffs debt against the surety, serjeant Fountain (not of counsil on either side) said it was doubtful whether equity should in this case bind the surety, who was not obliged in law, but in respect of the lien of the bond ; and that being lost and the surety having no benefit by (nor consideration for) being bound, he thought equity after so long a time should not charge the surety, the master of the rolls said he would see to moderate and mediate this matter between the parties ; in order to which, he was several times attended by the plaintiff; and the defendent making default, he decreed for the plaintiff, and afterwards the cause was, upon a case made, brought before my lord chancellor, who was of opinion with the master of rolls, and decreed it for the plaintiff, it was in the debate of this case, said, that if a grantee in a voluntary deed, or an obligee in a voluntary bond, lose the deed or bond, they should have *286 remedy against the grantor or obligor in equity, tamen quaere. but if so, no mistake in the principal case, where the bond was for money lent; and though the surety had no advantage, yet the obligee had parted with his money, and loss is as good a consideration for a promise, as benefit or profit.’
This case may be a match at least, if not an overmatch, for that in Yernon. neither of them states any reason for the decree. the case in Yernon was indeed determined a few years after the other ; hut, to compensate for this, the determination in the earlier was by his honor the master of the rolls, and his lordship, the chancellor ; in the other, by his lordship the keeper only ; so that here are two judges (one of them not a lord indeed) to one ; that in Yernon was upon the first opening ; that in the other was upon a case made brought before nvy lord chancellor, and therefore possibly, after deliberation, perhaps neither of them ought to be of oracular authority further than they are reconcilable with the principles'of justice, and the one in the chancery cases is thought reconcilable with tjiose principles.
If its authority be allowed, it is, in forensic phrase, a case in point, unless between a loss of the surety’s bond and the surety’s death in the lifetime of the principal debitor, by which events the obligees were deprived of their remedies at common law, be sucha difference as will, in equity, justify a decree, for the obligee in one case, and a dismission of his bill in the other case.
Judges, whose understandings elaborate erudition hath polished and recondite science hath illumined, may he able to discover such a difference, the commentator acknowledged!such a difference to have eluded his acumen ingenii.
The accident by which a party, in one case, was remediless at common law, was the loss of a paper; the accident, by which a party, in the other case, was remediless at common law, was the death of one man before another, — a difference, if material at all, favorable to the party in the latter case; because the accident thdre was, not through any default of her or her testator hut, an act of god, which the law itself declareth shall not injure any man. whereas the loss of the paper may have been through negligence of the obligee.
Perhaps this difference may be alleged that, in one case, by the bond, if it were ostensible, the surety might he chárged even at common law, so that the court of equity, giving relief in that case, doth nothing more than supply the want of evidence to prove existence of the bond, and enforce performance of an obligation praeexistent; but in the principal case, the bond is ostensible ; and the court of equity giving relief, instead of forcing performance of an obligation praeexistent, *287 upon which an action at common law is maintainable, would create a new obligation, the former being discharged, but this would bring us back to the question, whether a right were destroyed, or an obligation discharged, by the want of legal remedy to recover the right, or to exact performance of the obligation.
Now an obligation may be discharged either by an act of the Obligor, or by an act of the obligee.
1. By act of the obligor; when William Glaiborne and David Minge sealed and delivered their obligation, acknowledging themselves bound in 3000 pounds, payable to James Field, upon condition, that, if they paid 1500 pounds to him, the obligation should be void ; if they had paid 1500 pounds accordingly, the obligation would have been discharged, — would have been void, — by the letter of the contract.
2. By act of the obligee: if James Field had sealed and delivered an acquitance, the obligation would have been discharged by consent, neither of these having been in the case,
If the obligation were discharged, it must have been by an act of the law, or rather by an omission of the law, to provide a remedy for redress of a wrong ; but let it be called an act of the law. the case then is this :
By act of law, a man is deprived of his remedy to recover a just debt, on the other hand, one of the maxims of law is, <an act of the law shall never work a wrong.’
In such a case, Francis Bacon, in a tract intituled maxims of the law, under the rule, by him numbered 3, verba fortius accipiuntur contra proferentem, hath delivered a criterion, fit to be remembered, in these words : 1 a point worthy to be observed generally in the rales of the law is, that, when they encounter and cross one another, in any case, it be understood which the law holdeth worthier, and to be prefered; and it is in this particular very notable to consider that this being a rule of some strictness and rigor doth not, as it were, its office, but in absence of other rules which are of more equity and humanity.’
The man who thinks the rules of law, by an inference from which the bond in the principal case was affirmed, as is supposed, to have been discharged, strict and rigor o«s,and the maxim, an act of the law shall never work a wrong, equitable and humane ; and that the foresaid inference and maxim in this instance encounter and cross one another; such a man would incline to believe that a Bacon, if he had been the judge, even in a court of law, would not have said that the bond was discharged by the death of Minge in the lifetime of Glaiborne, although no action at common law could be maintained on the bond, what he *288 would probably have said, in another place, will be mentioned hereafter.
That author in the same tract hath inserted this rule, numbered 9, quod remedio destituitur ipsa re valet si culpa absit, to which are subjoined these paraphrastic terms : ‘ the benignity of the law is such, as when to preserve the principles and grounds of law it depriveth a man of his remedy without his own fault, it will rather put him in a better degree and condition than in a worse ; for if it disable him to pursue his action, or to make his clame, sometimes it will give him the thing itself by operation of law without any act of his own, sometimes it will give him a more beneficial remedy.’
If the genius of the common law inspires its judges with an inclination to invent and apply remedies for averting the perdition of rights, by operation of rigid'inflexible rules, — to uphold rights, although, for recovery thereof, those rules have disabled parties to pursue their actions, — in fine to put parties, so deprived of their actions, in a better condition, rather than in a worse ; may we not reasonably conjecture that the mystagogue of science, whose language was lately quoted, if when he adorned the english high court of chancerv, the principal case had been brought before him, would not, like the inexorable keeper, in the case of Ratcliffe versus Graves, have hurried the plaintiff from his presence, with a dismission of her bill, but that, inspired by the genius of equity, he would have pronounced a sentence somewhat in this form : ‘ the benignity of equity is such, that it will, when the law, to preserve its principles and grounds, depriveth a man of his remedy, without his own fault, give him a remedy equaly beneficial’ ? and would not such, a sentence have been in perfect concord with principles of equity, which hitherto have been acknowledged universaly, and from which examples of deviation occur not, except in two or three sudden selfwilled declarations of a lord keeper, that he would not charge a surety further than he was answerable at law, although neither he, nor any other man, ever pretended to assign a reason, nor, as is believed, was able to assign a reason, for the deviation ?
So much of the opinion as hath been considered, no doubt seemed to those who delivered it sufficient to evince the error of the reversed decree ; so that the following part appeareth to have been added per saturam,- but, as it is crammed therein, it must not be passed over; and it deserveth special notice, because it refereth to certain topics, from which, or from one of which, at least, an argument may be drawn powerfully supporting that decree, the eversion of which was intended.
*289 And no fraud or mistake appearing to have occurred in the *writing of the bond, [if the three men, who transacted this business, did intend to make a contract to this purpose ; that the representatives of David Minge, in the event of his death, in the lifetime of William Claiborne, should be discharged from their testators obligation to assure the repayment of the money borrowed Tby William Claiborne, with interest, every man will agree with the court of appeals, that no fraud or mistake occurred in the writing of the bond ; and perhaps the court of appeals will agree, with every other man, that the creditor was unwise in making such a contract, which was nothing but a wager, by which, in no event, he could gain any thing, and in one event might lose his stake.
But, if the parties did intend, that David Minge or his representatives should assure the repayment, in every event, as most men will suppose they did, and if the bond be writen in such a manner, that, unless the money were paid in the lifetime of both, the intended satisdation is confined to the single event of David Minges breathing after William Claiborne should cease to breathe, then the parties were deceived, — deception occurred in the writing of the bond; and if deception and fraud he convertible terms, as they are, if ordinary vocabularies err not, fraud occured in the writing of the bond.
Whether the party who gained by the deception meditated it or not? authorities perhaps, may make an important inquiry ; but if they do not decide otherwise, the pure principles of equity seem to teach, that a man ought not to suffer detriment by fraud, occurring in a contract, although the fraud were not premeditated, and the contract not studiously and industriously conceived in terms fey Which the party was harmed, the turpitude of the fraud, with that ingredient, is indeed the fouler for it; but the reason, why the contract ought not to be detrimental to the party, is supposed to he, that it was a contract which he did not mean to make, — a contract, to which, if he had known the purport of the terms used to declare it he would not have yielded his consent, — a contract not the image of the parties, intention, by which the writen act ought, to have been moulded, by the roman civil law, non videntwr, quierrant, consentiré. Dig. lib. L tit. XVII. Reg. exn § 2.
Further, if the parties did intend that David Minge or his representatives should assure repayment of the money borrowed, in all events, and the bond be writen in such a form that the satisdation would he ineffectual in one event, — an event which .neither the creditor nor perhaps either of the other parties had in contemplation ; — in other words, if the creditor, if all the *290 parties, did TAKE a bond to be what it is not, some men would NAME what occurred in the writing of the bond a MISTAKE, and would not be persuaded easily, that they gave it a MISNAME.
If a court of equity, because possibly not supported by authorities, would not relieve against a "fraud unpremeditated, that court, as is conceived, would not transgress its legitime bounds by granting relief against such a mistafce.
It is to be considered as a joint obligation,] it was stated to be, and therefore must have been considered, as a joint obligation,. both in the bill, and the reversed decree ; and because, being joint, an action at common law could not be maintained upon it, the executrix of the obligee, illadvised as unlucky, supplicated a court of equity to succour a conscientious demand-,, which the court of common law, although not an enemy to it,, and in truth the parent of it, could not befriend ; — a case occupying perhaps the first grade in the catalogue of cases, which are intitled to the salutiferous interposition of the court of equity, and for the sake of which that tribunal, auxiliary to the common law itself, was instituted, but vain was her application, for the bond was
Subject to the LEGAL consequence of Minge and his representatives being discharged by the death of him in the lifetime of Claiborne,] the sum of the opinion seems to be, that, when, for any cause whatever, an action at common law cannot be maintained against a surety, or his representative, on his bond, wherein with him the principal is bound jointly, unless he the surety was borrower or user of the money, or fraud or mistake appear to have occurred in the writing of the bond, the obligation is discharged in equity, if such be the opinion of the court of appeals, to reconcile it with fundamental general principles is not in the power of the commentator.
If this be not their opinion, what there or elsewhere can justify the final sentence
And that the said decree is eri'oneous ?] to which sentence however-, all people, within a certain district, must now submit; but which will not be approved, as is believed, by them any more than it will be approved byr others, let us vary the case, only, by supposing James Field to have been resident in Amsterdam, Paris, or some other foreign country, and William Claiborne and David Minge to have gone thither, and, for securing repayment of the borrowed money by William Claiborne, to have sealed and delivered their obligation there, instead of Princegeorge county in Virginia ; would the court of appeals have reversed the decree, in that case, for the executrix of James Field against the representative of David Minge? if not, what *291 reason can be assigned for the difference? if they would have reversed it, would foreigners think the justice of Virginia or the administrators of it proper subjects for panegyric ?

 Here is meant what, in contradistinction to the ritual, customary, feodal, &c, aptly may he called the common law, because it is the law common *275 to all men, impressed on the human mind in characters so legible and significant that every one may understand it; — in other words, the law of nature and reason, of which the praecepts are such that, to their rectitude assent is yielded, and to their authority the obligation of obedience is professed, by all, except the disciples of those who can he eloquent encomiasts of the most barbarous parts of what, by some of them, is alleged to have been the antient common law of England.

 In the case between Cage and Acton, reported by R. Raymond, 1 vol. p 515, where a man, who had bound himself in the penalty of 2000 pounds, pay able to the woman whom he married afterwards, with condition that the obliga tion should be void, if, in the event of her surviving him, his executors or administrators, should pay to her 1000 pounds, died before the wife, chief justice Holt, who was of opinion the bond was extinguished by the intermarriage, said, that, in such a case the chancery would not give relief; in which, however, the chancellor did not concur, for, in another case, found in the 2 vol. of Vernons reports, p. 480, upon that very bond, the chancery did give relief, and upon this principle partly, a debitor hath been adjudged to be discharged from his obligation, when he is appointed executor of the testament of his creditor, except in particular instances, in England this doctrine hath been approved by the court of equity, in cases innumerable, the authority of which may be thought by some sufficient to condemn the decree of the high court of chancery, in the principal case; in vindication whereof, however, is contended, first, that a determination, not founded in natural justice, in one case, ought not, by analogy, to be a precedent for authorising a similar determination in other cases differing from it in material facts and circumstances, as in the present instance, and that the determinations in favor of the debitors discharge are founded in natural justice no man but a bigot to authority, as is conceived, will affirm, and, secondly, another reason for those determinations is a disposition of the common law and chancery courts in England to preserve uniformity of decision with the ecclesiastical courts there, who have attributed to an executor the character of a residuary legatee.

 The propriety of this determination, so understood, originaly perhaps a reverie of some dull drowsy dreaming judge, which his successors, too lazy to examine it, have suffered time to mature’into an authority, is doubted ; because it seems not consistent with the notions of the common law itself: for an execution to satisfy a judgement against C and M jointly the law will compel either of them to discharge intirely, which seems a proof that each was bound for the whole, and consequently bound, in effect, severaly, although, in form, jointly, again, when C and M are bound in an obligation, called joint, for payment of money, if C die first, the whole may be recovered from M; if M die first, the whole may be recovered from C ; now, unless the death of one man, in the lifetime of another, can create an obligation in that other, which perhaps no man will affirm, C andM must have been originaly bound severaly.

 An action against the survivor of joint obligors is supposed to have been authorised by law, for the benefit of the obligee, of two, bound to perform an act, when one died before performance, the other, required to make amends for the whole wrong, might have objected, that the representatives of his associate in the contract ought to participate of the burthen proporttonaly. but the law prohibits a junction, in the same action, of one party, in his proper, with another party, in his representative, character, for several obvious reasons; nor will the law permit the obligee to maintain two actions for the same thing, because he might thus recover a double satisfaction for a single injury, the law therefore, abhorent from extinction of a right by failure of a remedy, alloweth an action to be maintained against the surviving obligor, and that lie too might not be injured, alloweth him to maintain an action against the representatives of the co-obligor, whereby the matter is finally adjusted without injury to any party, and unless one of the obligors shall have become insolvent, without detriment to any party.
The doctrine, stated in this note, the writer of it acknowledgeth to have sprung, as well as he can recollect, from his own invention, and hopes that he is not less happy in the discovery than chief justice Holt was, when he racked his more prolific invention, ("as we are informed he did, by Peere Williams, ia *279 ! vol. of his repon v, p. 21,) to discover the reason why joint estates, and the consequent rights by survivorship, in lands, are favored in law.
If the common la v, ,liom its antipathy to injury by failure of remedy, as well as by other causes, allowed the right of action to survive, for the benefit of an obligee, what must have been that logic of the common lawyers, when they affirmed, and common law judges too, when they determined, if judges ever did determine (see Vernons reports 2 vol. p. 99) that, where the surviving joint obligor was insolvent, the obligation of the defunct was discharged 1
That common lawyers, with whom must be, classed judges, have not been at all times so well acquainted with, or so attentive to, the rudiments and rituals of their own law, as not to have misunderstood them, or not to have argued fallaciously from them, is probable, if we may credit one who was well informed ; ‘ sir H. Spelman somewhere condemns the common lawyers of his own time, for the small acquaintance they had with the principles and rationale of their profession. ‘ we are all for profit,’ says he,c and lucrando pane,’ taking what we iind at market, without inquiring whence it came.’ Taylors elements of the civil law, p. 399. an error from a cause not altogether dissimilar, justice Forteseuo, in the preface to his reports, hath detected in Coke himself, the english Sulpitius, the juris antisies* of the common lawyers.
Let ns, for the sake of elucidation, reverse the case, and suppose one, of two joint obligees, to have died, and the other to have removed, carrying with him the bond, to parts unknown, in which case the representatives of the defunct obligee could no more maintain an action at common law against the obligor than, in the principal case, the obligee or his executrix could have maintained an action, against the representative of the defunct joint obligor: would the common lawyers say, because tho law gave no remedy, that the obligation was discharged? and, if judges should so determine, would not the couit of equity give the executor of the defunct a remedy against the obligor for so much, at least, of the money, as was due to the testator?
Let us suppose William Claiborne and David Minge to have perished together, by shipwieck, lightning, or some other accident, so that which of them last drew breath could not be proved; would the obligation have been discharged as to David Minge? and, if no action could have been maintained at common law would not the court of equity have decreed his representatives to pay the money.

 Quinctil. lib. XI. c. 1.

 This case is to be found in a thin folio, called chancery decisions, about a score, of many copies of it printed, have been sold, the author of it, who expected it would be thought to deserve a place in most law libraries, accounts for this neglect in a way suggested to him by the following passage in Plutarch : that biographer relates, that Cato, the censor, when he was eighty years of age, undertook to learn the language of the greeks, the cultivation of whose literature, believed by his countrymen to have enlightened them, he had, upon all occasions before, discouraged, vilified, reprobated, to punish him for this blasphemy, the rage, with which, at such an advanced period of his life, he was infected, for confabulation in a dialect new to him, was called a judgement upon him. the author of the chancery decisions was guilty of an offence somewhat similar, he had been for many years occasionaly speaking irreverently of some reported westmonasterian adjudications; to be punished for which, perhaps, he was afterwards seized with a rage for reporting-reporting his own adjudications too, which may be as unentertaining and unedifying as the senile garrulity of Cato in a language not his vernacular tongue, notwithstanding that work has been slighted, the authors cacoethes blasphemandi in that way is so inveterate that it may be pronounced insanabile. this opusculwm may be slighted in the same manner; yet his cacoethes edendi will break forth, when such occasions as this present fit subjects for his lucubrations.

 Sentences, exhibited sometimes in print, and inshrined, at other times, in MSS, of men in England, who, after inauguration by the coif, with the pageantry and grimace attending that ceremony, called by writs, or commissioned. >- by letters patent, are mounted on the one bench or the other, at Westminster, or who had been appointed masters of the rolls, or who had received the great seal from the hands, after kiasiug them, of his or her sacred majesty, with the titles of lord keepers or lord chancellors, — those sentences are called authorities, and are so respected that when a thing is said to be just or unjust, the speaker, who is required to prove it, in like manner as some men, not long ago, thought nothing necessary to prove a physical truth more than to shew that it had been affirmed by Aristotle, some where or othor in his works, supposeth the justice or injustice of the thing in question decisively proved, if he can shew it to have been declared to be just or unjust by some lord chief baron, lord chief justice, or one of their associates, or by his honor the master of the rolls, or by some lord keeper or lord chancellor, when one of these sentences, carried before the house of lords, is affirmed or reversed, the matter is then supposed to have been examined with extreme severity, and like subjects tortured in the experimentum crucis, to be incapable of further enucleation, these affirmations and reversals, by those judges in appeal, in that country, at all times after bear the stamp of *284 infallibility, to deny or dispute which is a dangerous heresy; for, in 1697, the court of kings bench having given a judgement, inconsistent with a determination of the nouse of lords, their supremacies, much offended, summoned the chief justice to give his reasons for the judgement, and when he refused to do so, threatened him with a commitment to the tower, reports by It. Raymond, 1 vol. p. 18. in numberless cases, and, among them, even where the question is, what was the meaning of a mans words in his testament! decads of heavy, huge, unwieldly, folio volumes, attended by a suitable number of quartos and octavos, are introduced, every one pretended to contain the report of a case in point, the authorities appear sometimes to jarr, and, when they do so, the english judges seldom fail, because it is very much their wish, to-reconcile them, when that is done, every one seems to be satisfied, but whether the authorities can be reconciled with common sense, often more difficult than reconcilement of them with one another, is rarely thought worth inquiry, the superstitious veneration for them even in America, is so deeply rooted, that the man who can rationaly expect he shall live until it is eradicated, ought to have antediluvian stamina.